LASSER, P.J.T.C.
Taxpayer contests the 1991 and 1992 real property tax assessments on the Lord & Taylor department store in the Rockaway *433 Townsquare Mall, shown as Block 11001, Lot 4 on the Rockaway Township tax map. The tax assessments in issue are:
1991 and 1992
Land $1,398,000
Impvts 7,140,300
Total $8,538,300
Rockaway Townsquare Mall (the mall) is a two-level, enclosed super-regional shopping mall[1] located at the four-way interchange of Interstate Route 80 and Mt. Hope and Mt. Pleasant Avenues. Completed in 1978, it is the only regional mall in Morris County and is acknowledged to be a successful mall with superior access, well positioned for future growth in the Morris County market area which it dominates. The mall has a total gross leasable area of approximately 1,200,000 square feet with four anchor department stores, Lord & Taylor, Sears, JC Penney and Macy’s, and 167 mall stores.[2] The mall property is zoned regional business district. This zone requires a minimum lot size of 50 acres and a maximum floor area of 30% of site ground area.
The Lord & Taylor store is constructed on 9.32 acres of land. The store building, built in 1979, contains approximately 154,000 square feet. The subject property is also improved with 267,143 square feet of asphalt paving, which accommodates at least 770 ears. The property was completely renovated in 1989 when it was converted from a Hahnes department store to the Lord & Taylor store. An affidavit of an officer of Torcon, Inc., the Lord & Taylor *434 conversion contractor, indicates a total cost of $5,876,919 for the conversion.
The Lord & Taylor store building consists of two levels, each connected to the mall portion of the shopping center. The store opened for business in the fall of 1989.
On January 31, 1990, the subject property was transferred by Adcor Really Corporation to Mays Center Associates Corporation as a part of a 37-department-store sale and leaseback transaction. Adcor is a subsidiary of Mays Department Stores Company. Both Hahnes and Lord & Taylor are divisions of Mays Department Stores Company. The deed transferring the subject property reports a total consideration of $7,812,000. Neither party relies on this deed as an indication of the value of the subject.
The property is subject to a reciprocal operating and easement agreement with the owner of the mall. The operating agreement provides for the integrated use of all the properties that make up the mall. In addition to parking cross-easements, the agreement requires Mays Department Stores Company to operate a departs ment store in the mall for 15 years and to use the subject property for an additional 14 years.
At trial, the parties entered into the following stipulations: (1) the land value of the subject property is $350,000 an acre or $3,300,000 (rounded); (2) the replacement cost of the building is $10,500,000; (3) the value of the site improvements after depreciation is $775,000; (4) the common-level ratios of assessment to true value promulgated by the Director of the Division of Taxation pursuant to N.J.S.A. 54:l-35a et seq. are:
Year Common Level Upper Limit Lower Limit
1991 57.74 66.40 49.08
1992 59.56 68.49 50.63
The appraisal experts for both parties are in agreement that the existing department store use is the highest and best use of the property.

*435
I.

Taxpayer’s first appraisal expert valued the property by the sales comparison, cost and income approaches to value. In his sales comparison approach, this expert relied on sales of four anchor department stores, two in Pennsylvania, one in Maryland and one in New Jersey, occurring between July 1987 and May 1990, as follows:
Store change Location Sale Price Date Land Building area size (acres) (sq.ft.) Sale price /sqJt. Indicated sale Estimated price of improvement subject depreciation /sq.ft. rate
Altmans to Sears Abington, PA 7/87 $ 7,000,000 6.912 155,800 45.93 3 $51.67 56%
Abraham & Straus to Sears Abington, PA 2/88 $10,290,000 17.66 233.000 44.16 $50.78
Hahnes to Fortunoff Woodbridge, NJ 5/89 $ 7,700,000 10.45 146,588 52.53 $55.16
Hutzlers to Hechts Baltimore, MD 5/90 $ 7,950,000 9.06 145.000 54.83 45%
This expert applied a value of $55 a square foot (land and building combined) to the subject for a value by this approach of $8,300,000 (rounded) (150,928 sqit. x $55 sq.ft.) for both 1991 and 1992.
Using these four sales this expert applied the extraction method to estimate a depreciation rate for use in his cost approach. For each sale property this method, (1) deducts the expert’s opinion of land value from the sale price of each sale to allocate the portion of the selling price attributable to improvements, (2) estimates the cost new of improvements, (3) subtracts the selling price allocated to improvements from the cost new to arrive at estimated accrued depreciation and (4) divides the accrued depreciation by cost new to yield an improvements depreciation rate. Using this method *436 this expert derived four depreciation rates ranging from 45% to 69%. This expert selected 57.5% as the depreciation rate to be applied to the subject improvements and an overall depreciation rate (land and building) of 45%. Based on the stipulated land value of $3,300,000 and the stipulated building cost of $10,500,000, these rates yield cost approach values of:
Replacement Cost New $10,500,000
Less Depreciation (57.5%) — 6,037,500
Add Depreciated Site Improvements + 775,000
Add Land Value + 3,300,000
Value Applying Improvements $ 8,537,500 Depreciation Rate
Building and Land $13,800,000
Less Depreciation (45%) - 6,210,000
Add Depreciation Site Improvements + 775,000
Value Applying Land and $ 8,365,000 Improvements Depreciation Rate
In his income approach, this expert relied on the following five department store rentals:
Tenant Location Sq.Ft. area Date rent Sq.Ft. start rent
# 1 Boscovs Moorestown, NJ (Burlington County) 161,946 10/90 $3.25
#2 Boscovs Voorhees, NJ (Camden County) 173,767 4/92 $3.00
# 3 JC Penney New Haven, CT 159,046 8/91 $4.67
# 4 JC Penney Phillipsburg, NJ 68,983 3/90 $3.90
#5 Sears Phillipsburg, NJ 89,733 9/89 $2.79
Substantial adjustments for differing lease terms, location, condition and quality and function, resulted in an opinion of rental value of the subject of $5.85 a square foot. This expert’s income approach calculations are:
*437 Gross annual income (150,928 sq. ft.
x $5.85/sq.ft.) $ 882,929
Less vacancy (2.5%) - 22,073
Operating expenses, $ 860,856
Management and reserves - 34,434
Net income $ 826,422
Capitalized at .0985 $8,390,071
Income approach value for 1991 and 1992 (rounded) $8,400,000
This expert’s final estimate of value is $8,300,000.
Taxpayer’s second appraisal expert reviewed the five leases used by taxpayer’s first expert and agreed with the substantial adjustments made by that expert to reflect the value of the subject. This second witness testified that the operating agreement between the mall owner and the anchor department store is beneficial to both. This expert conceded that the rents reflected in the five lease comparables do not reflect construction costs because the re-rental market is very limited and the owner is under some pressure to promptly replace a vacating anchor tenant with a new anchor tenant to assure continued high rentals from the mall tenants. He stated that loss of an anchor store drastically affects a mall, and the rental to a replacement anchor may not be an arms-length transaction. He added that the number of potential replacement tenants is small because the anchor must be a department store having a distribution center in the area.
This witness observed that the subject mall dominates its market area, and that sales volume is good, with mall tenant sales averaging over $300 a square foot and the anchor store sales averaging over $200 a square foot. This second expert witness estimated the following square-foot rentals in the subject mall:
*438 Kiosks $60-70
Food Court $30-45
Stores with 1000 or less square feet $30-32
Stores with 1000-2000 square feet $25
This second witness testified that an anchor store gives value to the mall stores and that the market value of anchor stores is reflected in low rents which are acceptable to an owner because of the transfer of value to the mall stores. The witness also acknowledged that Sears has greater bargaining power than the owner of the Phillipsburg Mall (lease #5).
Taxpayer’s third expert witness testified to a study that he made of sale volumes and rentals in shopping centers nationwide. From this study he concluded that, as the size of the store increases, the rent decreases, and as sales increase, rent increases. He testified that there is a very systematic market, but that the major influence on rent is size, not sales volume. This witness also opined that the operating agreement provides economic stability for the mall. From his study, this witness concluded that anchor store rentals are not artificially low. He stated that all space in the shopping center does not have the same value, although it may have the same cost.

II.

Taxing district presented one appraisal expert. This expert testified to a value for the subject property for 1991 and 1992 of $13,487,000. This value was derived from the cost approach as follows:
Building replacement cost $10,500,000
Less depreciation (10%) - 1,050,000
Depreciated building value Depreciated value of site impvts. $ 9,450,000 + 775,000
Total building and impvts. $10,225,000
Land value + 3,262,000
Total value $13,487,000[4]
*439 This expert’s depreciation factor was derived by the economic age-life method, based on a total economic life of 50 years and an effective age of 5 years (5 •*- 50 = .10). This witness stated that the 10% depreciation rate covered functional, external and physical depreciation.

III.

This case involves the separately-owned and separately-assessed Lord & Taylor portion of the Rockaway Townsquare Mall. There is no disagreement about the land value or the cost of the building and site improvements. The value of the property by the cost approach, before depreciation of the building, is $14,575,000. The building was built in 1979 and completely renovated in 1989 at a cost in excess of $5,800,000. The assessing dates in issue are October 1, 1990 and October 1, 1991. The only cost approach issue is the amount of depreciation to be applied to the building.
Taxpayer applied 57.5% depreciation to reduce the cost approach value to $8,300,000,[5] and taxing district applied 10% depreciation to reduce the cost approach value to $13,487,000 ($13,525,-000 if land value of $3,300,000 is used).
Taxpayer’s first appraisal expert’s sales comparison and income approaches are derived from sales and rentals of anchor store properties. The first two sales are of the Altmans and the Abraham & Straus department stores in Willow Grove Park Mall in Abington, Pennsylvania. The Altmans store closed in January 1986, and the property was purchased by the mall owner and sold to Sears as part of a three-property § 1031 Internal Revenue *440 Code exchange. The deed consideration was $12,000,000, but the transaction is said to have included a $5,000,000 contribution to Sears for renovation. Taxpayer’s expert used $7,000,000 as the sale price. The Abraham & Straus store sale of a larger store at over $10,000,000 before revaluation resulted from a decision by the owners to leave the Philadelphia suburban market.
The third sale is of the Hahnes store in Woodbridge Center Mall to Fortunoff. The Hahnes store was built on land leased from the Woodbridge Center Mall. The sale price of $7,500,000 was allocated by this expert at $4,800,000 for real estate and $2,700,000 for furniture and fixtures. He then allocated $2,900,000 to the fee value of the land. Adding this to $4,800,000 yielded $7,700,000, which he concluded would be the price paid for the land and building.
Taxing district’s expert testified that Hahnes’ personal property was not included in the Fortunoff sale. If it was included in the sale, the actual value of the personal property is not known. If an allocation is made between realty and personalty, it is advantageous to allocate in favor of personalty for tax depreciation and realty transfer tax purposes. The value of the leased-fee land is subject to opinion. The store was sold before renovation by Fortunoff and it is possible that Fortunoff would have paid more if Hahnes’ furniture, fixtures and equipment had been removed first.
The fourth sale, that of the Hutzlers Department Store in the Whitemarsh Mall in Baltimore County, Maryland to Mays Department Stores Company for use as a Hechts department store, was also a three-property exchange transaction. The deed consideration was $7,950,000, and the mall owner made a cash contribution to Mays Department Stores Company. In an exchange transaction, the sale price for all properties in the exchange may be set artificially high or artificially low. The latter may be a desirable alternative to minimize realty transfer fees.
I find from the testimony that the Rockaway Townsquare Mall is superior to both the Pennsylvania and Baltimore malls. I find further that the fact that the subject was completely renovated at substantial cost requires a significant adjustment. Because *441 of the uncertain nature of the sales information and the fact that the sales are of vacant department store buildings which had to be renovated and refitted to the needs of the purchaser after sale, whereas the subject had already been renovated and refitted, I find that the sales comparison approach of taxpayer is unreliable and therefore I do not accept this approach.[6]
Taxpayer’s first expert’s income approach was based on five rentals. I find that the subject location and physical condition and quality is substantially superior to that of the five rental properties.
The substantial adjustments that are required to be made to these five rents indicate the questionable reliability of this approach. However, as a check of my ultimate conclusion, I make the following adjustments:
Taxpayers’ expert’s rent adjustment—
Location Tenant Unadjusted sq. ft. rate Lease terms Location Physical condition/ building quality Adjusted sq. ft. rate
# 1 Boscovs Moorestown, NJ (Burlington County) $3.25 +25 +30 + 10 5.82
#2 Boscovs #3 JC Penney Voorhees, NJ (Camden County) New Haven, CT 3.00 4.67 +25 +25 +25 +20 + 5 5.84
# 4 JC Penney Phillipsburg, NJ 3.90 -25 + 100 0 5.85
# 5 Sears Phillipsburg, NJ 2.79 0 + 100 +5 5.86
The Court’s rent adjustment[7]-
Location Tenant Unadjusted sq. ft. rate Lease terms Location Physical condition/ building quality Adjusted sq. ft. rate
# 1 Boscovs Moorestown, NJ +25 + 50 +25 7.11
#2 Boscovs (Burlington County) Voorhees, NJ +25 + 65 +25 7.13
#3 JC Penney (Camden County) New Haven, CT -5 +50 +25 7.76
#4 JC Penney Phillipsburg, NJ -25 + 100 +25 6.58
#5 JC Penney Phillipsburg, NJ 0 + 100 +25 6.28
*442 From the foregoing, a square foot rental for the subject could be estimated at $7.00. The income approach estimate could thus be calculated as follows:
Net income (154,000 sq. ft.
x $7.00/sq. ft.) $1,078,000
Less vacancy (2Íé%) - 26,950
$1,051,050
Less ownership expenses (4%) - 42,042
Net operating income $1,009,008
This net operating income is derived from rentals of anchor stores. Taxpayer’s expert testified that shopping center owners are willing to accept a return on equity of as little as 3% on anchor stores. Capitalization of this net operating income at 7.25%[8] yields a value of $13,917,400 (rounded) by the income approach. Although I have performed this exercise as a check I do not rely on it to determine the proper assessment of the subject.
I note that the Lord & Taylor store is not a full-line department store. It is a clothing specialty store. Presumably, Lord & 'Taylor has higher profit margins and could pay a higher percentage of its gross sales as rent, if it was a tenant. Since the sales history of the subject property for the period 1990-1992 was not furnished, sales volume cannot be used as a check against the income approach.
From my analysis of the testimony of the experts, I reject the sales comparison and income approaches as unreliable. *443 I conclude that the evidence requires the property to be valued by the cost approach and I accept the taxing district’s expert’s cost approach value. The cost approach is the more reliable valuation approach in this case because land value and building and improvements cost are stipulated, leaving only the depreciation rate to be determined for a recently renovated building. I find no justification for 57.5% depreciation for a newly-renovated building and a resulting value for the property that is less than the land value plus the renovation cost. I find that taxing district’s expert’s 10% depreciation from all causes to be reasonable. Therefore, I find the value of the subject to be $13,525,000 allocated $3,300,000 to land and $10,225,000 to improvements.

IV.

Anchor store owners know that they are essential to the development of a shopping center, and in exchange for their undertakings in the operating agreement they obtain concessions from developers who are willing to make significant allowances to secure an anchor tenant. Taxpayer argues that the market is made by department store owners and developers who negotiate against a background of these concessions, and that there is a willingness on the part of the developer to accept low or no return on his anchor store investment.
From the evidence in this case, I conclude that there may be an allocation of cost or transfer of value from the anchor stores to the mall stores which might justify assessing anchor stores, not at their cost approach value, but, at a lower figure which reflects a transfer or allocation of value for the mall stores in excess of their cost.
Taxpayer’s second expert made reference to an article in the October 1992 issue of The Appraisal Journal. This article states:
Much of the confusion about the value of a super-regional shopping center arises when only a part of the total entity is valued without consideration of the complete project. A super-regional center must be viewed in its entirety to achieve an accurate valuation. This is because some parts of the property support or subsidize other parts to make the whole economically feasible. Therefore, both the *444 mall and anchor areas must be evaluated even though they may be owned by different individuals, partnerships, or corporations.
It is generally agreed that a mall area has to subsidize the cost of anchor space, or the entire center becomes a financial impossibility for its developer. The subsidy of the anchor tenant is necessary to ensure the success of all other tenants. [George R. Karvel & Peter J. Patchin, The Business Value of Super-Regional Shopping Centers and Malls, 60 The Appraisal Journal 453, 455 (1992) (footnote omitted).]
I have concluded the value of the subject to be $13,525,000. The amount of allocation of cost or value transferred to the remainder of the shopping center cannot be quantified because there is no evidence of either the assessments or the value of the mall stores, or the value of the mall stores and anchor stores together, or of the amount of value transferred. The entire shopping center is a single economic unit. Taxpayer attempts to value one segment of the entire center and then attribute a portion of that value to part or all of the remainder. I am unable to determine from the proof the allocation which must be made to reflect the value of the subject property which may have been transferred to the mall stores. See L. Bamberger & Co. v. Division of Tax Appeals, 1 N.J. 151, 158-59, 62 A.2d 389 (1948); Tower West Apartment Ass’n v. West New York, 2 N.J.Tax 565, 573 (Tax 1981), aff'd 5 N.J.Tax 478 (App.Div.1982); Sage v. Bernards Tp., 5 N.J.Tax 52, 72-73 (Tax 1982); Purex Corp. v. Paterson, 8 N.J.Tax 121, 123-24 (Tax 1986); Community Corp. v. Montague Tp., 9 N.J.Tax 398, 404-05 (Tax 1987), aff'd, 10 N.J.Tax 237 (App.Div.1988). Taxpayer’s appraisal expert’s value is subject to and, thus, reduced by the operating agreement with the owner. There is no testimony of the dollar effect of the operating agreement on the value of the subject or the mall stores by taxpayer’s experts.
The 1991 and 1992 assessments in issue total $8,538,300 for each year. Since the ratio of this assessment to the $13,525,000 value of the subject is 63%, which is within the common level range for 1991 and 1992, the 1991 and 1992 assessments are affirmed.

The Shopping Center Trade Association publication Dollars and Cents of Shopping Centers defines a super-regional mall as having 600,000 to 1,500,000 square feet of gross leasable area including three or more full-line department stores.

 Mall stores are also referred to as core stores or small stores. They are the smaller specialty stores and kiosks in the central mall areas as distinct from the anchor department stores.

 $13,525,000 using stipulated land value of $3,300,000.

 In the 1990 case contesting the assessment on the same property, taxpayer's expert used a 31% depreciation rate and relied on three of the same sales used in the subject case.

 The first three sales had previously been rejected by this court in Sears, Roebuck & Co. v. Rockaway Tp., 12 N.J.Tax 381 (Tax 1992).

 Taxpayer’s expert made adjustments in sequence. It is more appropriate to add location and physical conditions/quality together before multiplying by the result of the actual rent times the lease term factor to affect a cumulative percentage adjustment of causally interrelated elements. See Appraisal Institute The Appraisal of Real Estate 392 (10th ed. 1992).

 If an equity rate of 3% is used instead of taxpayer’s appraisal expert’s 12% equily rate, the overall capitalization rate is reduced to approximately 7.25%.

 This figure should be corrected to $44.93.